UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IHEART COMMUNICATIONS, INC., ET AL., | § § § | |
| *Plaintiffs*, | § § § | |
| | § | Civil Action No.  SA-17-CV-00009-XR |
| *v*. | § § | |
| BENEFIT STREET PARTNERS LLC, ET AL., | § § § | |
| *Defendants*. | § § | |

## ORDER

On this date, the Court considered Plaintiffs iHeart Communications, Inc. and Broader Media LLC's Motion to Remand (Docket no. 45). After careful consideration, the Court GRANTS the motion. This case is hereby REMANDED to the state court.

## BACKGROUND[1]

### I.    The Parties

Plaintiff iHeart (formerly Clear Channel Communications, Inc.) is a San Antonio-based mass media company that owns over 850 radio stations nationwide, along with numerous other business entities and holding companies. For purposes of this litigation, the most important of these entities is Plaintiff Broader Media, LLC. Broader Media is a wholly-owned subsidiary of Clear Channel Holdings, Inc., which is a wholly-owned subsidiary of iHeart.

Plaintiffs name 33 defendants in their petition. They have since added a thirty-fourth through an unopposed motion, which the Court granted.  Docket nos. 52, 53. These defendants

---

[1] Unless otherwise noted, these facts are taken from the allegations of Plaintiffs' live complaint. Docket no. 1-9 at 1–46 (Plaintiffs' First Amended Petition).

1

can be categorized into two groups based on the role that they play in relation to iHeart's debt—noteholders and trustees.

The bulk of the defendants named in this lawsuit are noteholders (31 of the 34). These Noteholder Defendants are investors—primarily hedge funds—that have acquired a portion of iHeart's debt by purchasing iHeart's Priority Guarantee Notes. At least some of these defendants are international entities. *See* Docket no. 1 at 4.

The remaining three defendants—U.S. Bank National Association, Wilmington Trust, National Association, and UMB Bank, National Association—are designated as trustees through the notes' indentures, which are separate contracts between iHeart and the Trustees that relate to the Priority Guarantee Notes. As Trustees, they have certain powers and obligations related to the notes, which were issued by iHeart and are now held by the Noteholder Defendants. It does not appear that the Trustees themselves own any of iHeart's debt; if they do, it is not relevant to this lawsuit.

As will be detailed later, iHeart took on debt to obtain financing. Some of this debt is publicly traded. Some of the debt is in the form of notes, which are governed by an accompanying set of indentures. The indentures are the primary subject of this lawsuit.

## II.   iHeart's Debt

iHeart's debt structure is vast and complex. Two particular types of debt are important for purposes of this lawsuit—iHeart's 2018 and 2021 Senior Notes ("the Senior Notes") and iHeart's Priority Guarantee Notes ("the PGNs").

### a.  The Senior Notes

Plaintiffs' petition is scant on details regarding the creation of the Senior Notes, which come in two series—the 10% Senior Notes due in 2018, and the 10% Senior Notes due in 2021.

The petition indicates that these notes are publicly traded. It does *not* appear that they are held by the Noteholder Defendants.

The Senior Notes are important to this case because iHeart sought to repurchase them, has in fact repurchased them, and wants to repurchase them in the future. iHeart, noticing that its public debt was trading at "a significant discount to face value," decided to repurchase some of its debt from the market. The means by which iHeart sought to accomplish this goal will be described in more detail later; for now, it suffices to point out that iHeart sought to use its subsidiary, Broader Media, to repurchase the debt. The Noteholder Defendants challenged Broader Media's potential repurchase of iHeart debt as a violation of the indentures governing the notes that they hold. In this lawsuit, iHeart and Broader Media seek a declaration that the past repurchases of the 2018 Senior Notes complied with the indentures, and that planned future repurchases of the 2018 Senior Notes, the 2021 Senior Notes, and the PGNs also comply with the indentures.

### b. The PGNs

#### i. Issuance of the PGNs

iHeart issued five series of PGNs in which the Noteholder Defendants collectively own a minority stake.[2] Before issuing the PGNs, iHeart marketed them in various offering circulars. *See* Docket nos. 60-4, 60-5, 60-6, 60-7, 60-8. These circulars contain language indicating that the PGNs may be purchased by international investors, but no requirement that they must be. *E.g.*, Docket no. 60-4 at 2, 3, 5. Whether the PGNs were ultimately sold to international or domestic investors, iHeart did not issue the PGNs directly to these investors. *Id.* Instead, iHeart had previously entered into an agreement with a group of initial purchasers, who were all domestic

---

[2] These series are: (1) the 9% PGNs due in 2019; (2) the 9% PGNs due in 2021; (3) the 11.25% PGNs due in 2021; (4) the 9% PGNs due in 2022; and (5) the 10.625% PGNs due in 2023. There does not appear to be a relevant distinction between the different series for purposes of this lawsuit.

entities. *Id.* Under this agreement, the initial purchasers (collectively) agreed to purchase the full amount of PGNs. *Id.* After this initial issuance, the initial purchasers would re-sell the PGNs to the ultimate investors. *Id.* The offering circulars make clear that the information contained therein is provided by iHeart, that iHeart is indemnifying the initial purchasers, and that the PGNs may ultimately be sold internationally. *Id.* The offering circulars also make clear that the initial purchasers have significant discretion to change the terms of the offering and reject any investor's offer. *Id.*

### ii.  Indentures to the PGNs

Each series of PGN is governed by an indenture,[3] which is a contract between iHeart, certain iHeart subsidiaries named as guarantors who are not relevant to this lawsuit, and a trustee. *E.g., Docket no. 1-8 at 49.* Depending on the series of PGN, the trustee is one of the three Trustee Defendants. Noteholders are not parties or signatories to the indentures. All parties to the indentures are domestic entities.

Parts of the indentures relate directly to the PGNs—for example, the indentures require iHeart to pay interest on the PGNs and repay the principal balance at maturity. Other parts relate more broadly to iHeart's conduct, limiting what iHeart can and cannot do with its assets. The present dispute concerns whether iHeart's plan to repurchase some of its publicly traded debt violates the indentures.

The indentures state that an Event of Default will occur on the PGNs if iHeart fails to comply with the indentures after the trustee or a 25% stake of noteholders gives written Notice of the Default and a 60-day period to cure. Docket no. 1-7 at 3. An Event of Default allows the noteholders to accelerate the notes and immediately demand the principal amount due. *Id.* at 5.

---

[3] Though there are five separate indentures to govern each separate series of PGN, the parties do not dispute that each indenture is identical to the others in all relevant respects. Docket no. 60 at 7 n. 6.

Beyond limiting iHeart in certain ways, the indentures define the role of the Trustees with respect to the PGNs. Chief among the Trustees' duties are certain actions if an Event of Default occurs. These duties vary from event to event, but in the Noteholder Defendants' words, the Trustees "have specific, ongoing duties regarding the enforcement of the Indentures if an Event of Default occurs." Docket no. 1 at 6; *see also id.* at 7 (stating that the Trustees provide "ongoing supervision" to the indentures). The indentures set forth the Trustees' rights in carrying out these duties. *Id.* at 9–10.

Aside from acting as trustees, the Trustee Defendants are paying agents, registrars, and transfer agents for the PGNs. *See* Docket no. 1-8 at 49. Again, using the Noteholder Defendants' description of the Trustee Defendants:

> The Trustees serve a critical role in connection with issuance and administration of the Notes. Among many other things, they maintain a list of all holders of the Notes, serve as paying agent, registrar, authentication agent, and transfer agent, select notes for redemption, receive iHeart's periodic certification of compliance with its obligations under the Indentures, and make periodic reports to holders of the Notes. They also are authorized to "pursue any available remedy" to collect defaulted payments on the Notes and "to enforce any provision of the Notes" or the Indentures, accelerate the Notes upon an Event of Default, file bankruptcy proofs of claim in respect of the Notes, and receive and hold collateral and any proceeds of collateral.

Docket no. 60 at 14 (internal citations to the indentures omitted).

## III.  iHeart's Seeks to Reacquire its Debt

Noticing that its debt was trading "at historic discounts to its face value," iHeart began planning to repurchase this debt in the fall of 2015. iHeart decided on a plan that employed its business holdings. iHeart owns all of Clear Channel Holdings, Inc. ("CCH") and Broader Media, along with 90% of the outstanding shares of Clear Channel Outdoor Holdings, Inc. ("CCOH"). In December 2015, with the ultimate goal of repurchasing its debt, iHeart caused CCH to transfer 100 million Class A shares of CCOH stock to Broader Media, which would then use this

contribution to repurchase iHeart's low-trading debt. iHeart reported this "Capital Contribution" in its SEC filings.

The Capital Contribution was necessitated by the indentures, which forced iHeart to engage in this complicated plan because of the indentures' restrictions on iHeart. The indentures' "restrictive covenants" limit what iHeart and its "Restricted Subsidiaries" (as defined by the indentures) can do with their assets. Under the indentures, CCH is a restricted subsidiary, but Broader Media is an unrestricted subsidiary and is not limited by the restrictive covenants.

These covenants have exceptions, including certain "baskets" that allow for disposition and investment of iHeart assets up to certain amounts. Some of these baskets have a specified purpose and allow for a certain amount of a specific type of investment. One basket is the general purpose Permitted Investment basket that allows iHeart and its restricted subsidiaries to invest in a broad set of ways, so long as these investments are "Permitted" (as defined in the indentures). Under the indentures, the Permitted Investment basket allows for up to $600 million in this type of investment.

In the context of the indentures, iHeart's plan was to cause its restricted subsidiary, CCH, to transfer CCOH shares to Broader Media as a Permitted Investment within the dollar limits remaining in the Permitted Investment basket. Broader Media could then use this capital to repurchase iHeart's debt, free and clear of the restrictive covenants in the indentures because Broader Media is an unrestricted subsidiary. iHeart maintains that this Capital Contribution was both an "investment" and a "Permitted Investment" under the indentures, and that there was sufficient space in the Permitted Investment basket at the time iHeart made the transaction.[4]

---

[4] In calculating the value of this investment, iHeart used the NYSE's closing price for Class A CCOH shares on the date it caused CCH to transfer the shares to Broader Media—at $5.16 per share, a contribution of 100 million shares is an investment of $516 million. iHeart maintains that it had enough space in its Permitted Investment basket to make an investment of this size, and that this was a proper valuation method.

**IV.     Noteholder Defendants' Response**

After learning of the Capital Contribution, some or all of the Noteholder Defendants engaged a group of financial advisors and lawyers. Negotiations with iHeart ensued. According to the iHeart's allegations, these Defendants "conspired together to threaten iHeart with baseless Notices of Default [on the PGNs] with the goal of forcing iHeart to unwind the Capital Contribution . . . After agreeing to act together as a group, Defendants pursued this strategy and additionally sought to force iHeart to grant them unwarranted economic concessions at the expense of iHeart and its other stakeholders."

On January 5, 2016, Jones Day, the law firm representing some faction of the Noteholder Defendants, sent a letter to iHeart indicating that the Capital Contribution violated the indentures (iHeart alleges that the Noteholder Defendants knew this was not true). In particular, the letter states that (1) the Capital Contribution was barred by certain restrictive covenants in the indentures; (2) because the Capital Contribution was barred, it would need to be a Permitted Investment and fit in to that basket; and (3) the Capital Contribution was not a Permitted Investment. The letter indicated that the Noteholder Defendants were willing to work towards a "negotiated resolution." iHeart responded with a letter on January 15, 2016, characterizing the Noteholder Defendants' accusation as "baseless" and harmful to iHeart's business. The parties continued negotiating amidst a series of leaks to the press and preliminary agreements. Ultimately, iHeart felt that a resolution could not be reached because the Noteholder Defendants' demands were "unreasonable."

**V.     The Initial State Court Litigation**

On March 7, 2016, iHeart instituted a lawsuit by filing an original petition in the 224th Judicial District Court in Bexar County, Texas. iHeart sought a declaration that the Capital

Contribution complied with the indentures, and an injunction preventing the Noteholder Defendants from issuing Notices of Default. Later that day, all of the Noteholder Defendants (except one) issued Notices of Default[5] on two grounds: (1) the Capital Contribution was not an "investment" because it lacked a profit motive; and (2) iHeart undervalued CCOH's shares when CCH transferred them to Broader Media, and based on a proper valuation, iHeart did not have enough room in its Permitted Investment basket to make the Capital Contribution without violating the indentures. The next day, iHeart amended its petition to reflect the issuance of the Notices of Default and sought a temporary restraining order rescinding the Notices. The next day, the state court issued the TRO, part of which also prevented iHeart from using the Capital Contribution to buy back its debt.

After the parties agreed to extend the TRO through the end of a trial on the merits, the case proceeded to a bench trial before Judge Cathleen Stryker. Judge Stryker issued a final judgment in favor of iHeart on May 24, 2016, declaring that "a. iHeart is not in default under the Indentures governing the Notes as a result of the Capital Contribution; b. The Capital Contribution did not violate the Indentures governing the Notes; c. The Capital Contribution was an Investment and a Permitted Investment under the Indentures governing the Notes; and d. The Capital Contribution is not a basis for Defendants to accelerate the Notes under the Indentures governing the Notes." Judge Stryker issued a permanent injunction, rescinding the Notices of Default and enjoining the Noteholder Defendants from issuing further Notices of Default in connection with the Capital Contribution. Judge Stryker also lifted the portion of the TRO that prevented iHeart from purchasing back its debt.

---

[5] Under the indentures, a 25% stake in a particular series of note was required to issue a Notice of Default; collectively, the Noteholder Defendants satisfied this threshold. The only Noteholder Defendant to not participate in these Notices of Default was Canyon Capital Advisors, LLC.

## VI.    The Present Litigation

This litigation is an extension of the initial state court lawsuit decided by Judge Stryker. In their petition, which they originally filed in state court, Plaintiffs seek damages from the Noteholder Defendants for: (1) tortious interference with prospective business relations; (2) economic duress; (3) civil conspiracy; and (4) breach of the covenant of good faith and fair dealing.[6] The damages portions of this lawsuit are based on past repurchases of iHeart debt. In July 2016, after Judge Stryker's declaratory judgment, Broader Media purchased 2018 Senior Notes with a face value of $383 million for a price of $222 million. Because of the delay caused by the negotiations, Notices of Default, and state court litigation, iHeart alleges that this purchase was approximately $100 million higher than the price it could have paid if it made the same purchase in February 2016.

In addition to the damages claims, Plaintiffs seek two declaratory judgments against all defendants, including the Trustee Defendants. Plaintiffs seek (1) a declaration that Broader Media's previous repurchase of the 2018 Senior Notes did not violate the indentures and that Notices of Default based on these repurchases are not permitted by the indentures; and (2) a declaration that any of Broader Media's future repurchases of iHeart's debt (including the 2018 Senior Notes, 2021 Senior Notes, and PGNs) would not violate the indentures. Plaintiffs expressly stated that the Trustee Defendants are not accused of any wrongdoing, and that they are added as defendants in this action solely because of their roles in administering the PGNs through the indentures. Docket no. 1-9 at 3 n. 1 ("[iHeart] has also named as defendants the [3] trustees appointed under the Notes with certain powers concerning the Notes . . . [iHeart] has named the Trustees as defendants, solely for the Declaratory Judgment counts, because of their roles under the Notes. [iHeart] does not allege that the Trustees have participated in the improper

---

[6] Plaintiffs do not assert this fourth cause of action against Noteholder Defendant Canyon.

conduct of the other Defendants and does not seek monetary damages from the Trustees."). Later briefing from Plaintiffs clarifies that the Trustees are added as defendants in this lawsuit "for notice purposes." *See* Docket no. 45 at 15. Because the Trustee Defendants have certain duties and rights under the indentures, and this lawsuit implicates whether and how iHeart's actions will trigger those duties and rights, the Trustees are named so that they will be on notice of any declaratory judgments construing iHeart's actions in light of the indentures.

On January 1, 2017, a group of the Noteholder Defendants removed the action to this Court. Docket no. 1. They assert that this Court has jurisdiction over the declaratory judgement claims through the Edge Act, 12 U.S.C. § 632, and supplemental jurisdiction over the damages claims. On January 17, 2017, per the parties' request, the Court set a briefing schedule for Plaintiffs' motion to remand. *See* Text Order dated January 17, 2017. Plaintiffs timely filed their motion to remand under 28 U.S.C. § 1447, and the parties followed the briefing schedule. Accordingly, Plaintiffs' motion to remand is now ripe.[7]

## DISCUSSION

## I.   Legal Standard—the Edge Act, 12 U.S.C. § 632

The Noteholder Defendants' only asserted basis for removal jurisdiction is the Edge Act, 12 U.S.C. § 632, which they argue creates federal subject matter jurisdiction over Plaintiffs' declaratory judgment claims (and that this Court should exercise supplemental jurisdiction over the damages claims).[8] With this as the Noteholder Defendants' only contention for the existence of subject matter jurisdiction, the question before the Court is a narrow one—is there Edge Act jurisdiction over the declaratory judgment claims in this case?

---

[7] After Plaintiffs filed their reply in support of their motion to remand, the Noteholder Defendants filed a motion for leave to file a sur-reply in opposition with their proposed sur-reply attached. Docket no. 65. Plaintiffs filed a response opposing leave for the Noteholders to file their sur-reply. Much of the Plaintiffs' response in opposition to leave is actually a response to the sur-reply itself. The Court thus GRANTS the Noteholder Defendants leave to file their sur-reply, Docket no. 65, and also considers the Plaintiffs' response in opposition, Docket no. 68.

[8] As the language of the statute makes clear, the Edge Act provides its own basis for removal.

The relevant jurisdictional provision of the Edge Act reads as follows:

Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations,[9] either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits; and any defendant in any such suit may, at any time before the trial thereof, remove such suits from a State court into the district court of the United States for the proper district by following the procedure for the removal of causes otherwise provided by law.

12 U.S.C. § 632.

Congress passed the Edge Act in 1919, authorizing the creation of federally-chartered "Edge Act banks" or "Edge Act corporations."[10] In the Act, Congress included a statement of purpose: "The Congress declares that it is the purpose of [the Edge Act] to provide for the establishment of international banking and financial corporations operating under Federal supervision with powers sufficiently broad to enable them to compete effectively with similar foreign-owned institutions in the United States and abroad." 12 U.S.C. § 611a.

In 1933, Congress passed the current 12 U.S.C. § 632 as part of the Glass–Steagall Act, extending federal jurisdiction to certain cases involving Edge Act entities. Subsequent case law spelled out the legislative history behind § 632:

Looking back to the Edge Act itself, however, one can divine the likely reasons for the grant of federal jurisdiction that would follow 14 years later. Crafted in the

---

[9] The remainder of this order will use the term "offshore financial transactions" to refer to these three types of transactions ("[1] international or foreign banking, or [2] banking in a dependency or insular possession of the United States, or [3] out of other international or foreign financial operations"). The parties use similar phrases in their briefing to discuss these transactions. The Court does not use this phrase as a term of art with any particular legal significance. It is simply a placeholder for the types of international financial or banking transactions described in the statute. More specific language will be used where necessary.

[10] This order will use the phrase "Edge Act entity" to refer to either an Edge Act corporation or an Edge Act bank; in this case, there does not appear to be any relevance to whether an entity is more precisely categorized as a corporation or a bank under the Edge Act.

wake of the turmoil that the World War had caused in international financial markets, the Edge Act called forth a new type of federally controlled institution intended to increase the stability of, and the public's confidence in, international markets. Federal supervision of these financial institutions was seen as essential if they were ever to succeed in the international marketplace. Thus a Governor of the Federal Reserve Board would tell the Senate Committee on Banking and Currency that:

> The time will probably come when the conflict of the dual control exercised by the Federal Reserve Board and by the banking department of a State may be a matter of embarrassment or operate to restrict the activities of the banking corporation[, and] the benefits and protection of a Federal charter . . . would be of great value in competing for business in foreign countries.

We infer, therefore, that the substantive federal regulations that the Congress placed upon Edge Act corporations, to be supplemented by the oversight of the Federal Reserve Board, are intended to facilitate and stimulate international trade by providing the uniformity of federal law.

*A.I. Trade Fin., Inc. v. Petra Intern. Banking Corp.*, 62 F.3d 1454, 1462 (D.C. Cir. 1995) (citations omitted) (alterations original). In other words, "[t]he apparent purpose of § 632 was to give Edge Act banks predictable uniformity of adjudication supervised in the federal courts, and thus better protection against potentially divergent and conflicting strictures imposed by banking authorities of 48 states." *American Intern. Group, Inc. v. Bank of America*, 712 F.3d 775, 779 (2d Cir. 2013) [hereinafter *AIG*].

With this legislative background in mind, the Second Circuit provided a thorough textual analysis of § 632 to determine precisely what elements must exist in order for the statute to provide federal jurisdiction. *See AIG*, 712 F.3d at 779–84. In *AIG*, the Second Circuit focused on a small but impactful ambiguity in the text of § 632—"whether the offshore banking transaction out of which the suit must arise must be a transaction of the Edge Act corporation that must be a party to the suit, or whether any offshore banking transaction suffices, regardless of whether that corporation was involved in it." *Id*. at 780.

The court based its analysis on the following italicized language from § 632:

> . . . arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, *either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries* . . .

*Id*. at 780. As a starting point, the court reasoned that if § 632 authorized jurisdiction in situations where the offshore banking transaction was *not* undertaken by the Edge Act corporation in the lawsuit, the italicized phrase would be superfluous. *Id*. From there, the court confirmed its conclusion by looking to the grammar and purposes of § 632. Grammatically, the court noted that the drafters of § 632 included a comma before the italicized phrase, showing their intent to apply this modifying phrase to the whole series of all three potential offshore banking transactions; thus, the italicized language modifies and applies to all three categories of offshore banking transactions upon which § 632 might confer jurisdiction. *Id*. at 781–82. As for the legislative intent, the court found no reason why the italicized phrase would further the Edge Act's purposes if it applied only to the third type of offshore banking transaction but not the first two. *Id*. at 782. The court held that "§ 632 provides that in order for its grant of federal jurisdiction and removability to apply, the suit must have a federally chartered corporation as a party, and the suit must arise out of an offshore banking or financial transaction *of that federally chartered corporation*." *Id*. at 784 (emphasis added). Later courts have read *AIG* as "inserting a formal nexus requirement into the Edge Act: section 632 only confers federal jurisdiction if the suit arises out of an offshore banking or financial transaction *of that federally chartered corporation*." *E.g.*, *Salix Capital U.S. Inc. v. Banc of Am. Sec. LLC*, 13 CIV. 2297 NRB, 2013 WL 6847064, at *6 (S.D.N.Y. Dec. 30, 2013) (emphasis original) (internal quotations omitted).

Defendants in this case do not object to *AIG*'s techniques of statutory construction, nor do they provide an alternative reading of the statute to indicate that the offshore financial transaction required by § 632 need not be that of the Edge Act entity. Though *AIG* is not binding on this Court, numerous other district courts outside of the Second Circuit have followed it. *People v. Wells Fargo & Co.*, CV 15-4181-GW(FFMX), 2015 WL 4886391, at *3 (C.D. Cal. Aug. 13, 2015); *Liberty Physical Med. & Rehab., P.C. v. Cha*, CV 16-4883 (JLL), 2017 WL 56523, at *4 (D.N.J. Jan. 4, 2017); *F.D.I.C. ex rel. Colonia Bank v. Banc of Am. Funding Corp.*, 2:12-CV-791-WKW, 2013 WL 3968017, at *4 (M.D. Ala. Aug. 1, 2013). This Court does the same.

To summarize, the following must be true in order for the Edge Act to provide a basis for removal to federal court: (1) the case must be a civil suit "at common law or in equity"; (2) an Edge Act entity must be a party to the suit; and (3) the suit must arise out of an offshore financial transaction of the Edge Act entity that is a party to the suit. *See AIG*, 712 F.3d at 784.[11]

## II.    Analysis

In this case, there is no dispute that this is a civil suit "at common law or in equity"—or at least that Plaintiffs' declaratory judgment claims are presented in such a suit.[12] Likewise, there is no dispute that the Trustee Defendants, which are parties to this lawsuit, are "corporation[s] organized under the laws of the United States." This Court's jurisdiction thus turns on the third

---

[11] "The statute thus means that [1] civil suits may be brought in, or removed to the federal courts if [2] [a]ny corporation organized under the laws of the United States shall be a party, and [3] the suit arises out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of international or foreign financial operations, *which it has conducted* either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries." *AIG*, 712 F.3d at 780–81 (emphasis added) (internal alterations and quotations omitted).

[12] On this point, the Court clarifies that the only asserted basis for jurisdiction is that the *declaratory judgment claims alone* are subject to Edge Act jurisdiction, while the damages claims are subject to supplemental jurisdiction. Thus, discussions of whether this suit is within the Edge Act's grant of federal jurisdiction are more precisely focused on whether *the declaratory judgment claims* are within the Edge Act.

requirement—whether Plaintiffs' declaratory judgment claims arise out of an offshore financial transaction of the Trustee Defendants.

On this point, the parties have two main disputes. First, what is the transaction out of which the declaratory judgment claims arise? Second, is that transaction an offshore financial transaction of the Trustee Defendants?

### a. Defining the transaction out of which the declaratory judgment claims arise.

Plaintiffs argue that the transaction out of which the declaratory judgment claims arise is Broader Media's repurchase of iHeart debt following the Capital Contribution. Docket no. 45 at 3 ("The claim 'arises out of' iHeart's repurchases of some of its debt; the Trustees had no involvement in those repurchases."). The Noteholder Defendants argue that "[t]he pertinent Edge Act 'transactions' here are the financing transactions that include the Indentures and the Notes" Docket no. 60 at 17.[13] The Court agrees with the Noteholder Defendants.

### i. The declaratory judgment claims do not arise from Broader Media's debt repurchases alone.

As an initial matter, Plaintiffs' position is too narrow; the declaratory judgment claims arise out of something larger than Broader Media's repurchases of iHeart's debt in isolation. Plaintiffs argue that they "seek a declaratory judgment of the lawfulness of Broader Media's debt purchases in July 2016 as well as future debt purchases." Docket no. 62 at 10. Plaintiffs' use of the phrase "lawfulness" here is misleading—Plaintiffs are not simply seeking a declaration that the debt repurchases are *lawful*, but rather a declaration that the repurchases are lawful *because they comply with the indentures*. In other words, the declaratory judgment claims are about how

---

[13] In their Notice of Removal, the Noteholder Defendants made much of the Trustee Defendants' obligation to engage in "ongoing supervision" of the PGNs under the indentures. Docket no. 1 at 6. In their response to the Motion to Remand, the Noteholders seemingly abandon the theory that the declaratory judgment claims "arise from" these obligations of the Trustees. *See* Docket no. 60. Plaintiffs' response to this argument is correct—there is no explanation of how the Trustees' "ongoing supervision of enforcement of the notes" gave rise to the declaratory judgment claims, particularly where the Trustees are accused of no wrongdoing. Docket no. 45 at 14.

the debt repurchases relate to the terms of the indentures, as shown by Plaintiffs' frequent references to the indentures and their terms in the live complaint. *E.g.,* Docket no. 1-9 at 1, ¶ 1 ("The Notes are governed by Indentures, which are contracts setting forth the obligations of the Company and the owners of the Notes"); 6 ¶ 12 ("Defendants have asserted (wrongly) that such debt repurchases would violate the Indentures' restrictive covenants"); 43 ¶ 179 (seeking a declaration that "Broader Media's Purchase of 2018 Notes did not violate the Indentures, and that Notices of Default based on Broader Media's Purchase of 2018 Notes would not be permitted by the Indentures"); 44 ¶ 193 (seeking a declaration that "additional repurchases of iHeart debt by Broader Media would not violate the Indentures."). These allegations and claims make clear that Plaintiffs are challenging the indentures just as much as they are challenging the Noteholder Defendants opposition to Broader Media's debt repurchases. In fact, the two are one in the same.

Plaintiffs cite a series of cases to distinguish a "background transaction" (in their view, the "underlying contracts") from a "dispute-triggering transaction" (in their view, the debt repurchases). *Diaz v. Pan Am. Fed. Sav. & Loan Ass'n*, 635 F.2d 30, 31 (1st Cir. 1980); *Sollitt v. KeyCorp*, 463 F. App'x 471 (6th Cir. 2012). This distinction is logical, but as the Noteholder Defendants point out it does not apply on these facts.

In *Diaz*, an individual drew several bad checks against Pan American Federal Savings and Loan Association (an Edge Act entity), which then caused criminal charges to be filed against the individual. *Diaz*, 635 F.2d at 31. The individual sued Pan American for malicious prosecution in federal court on the basis of § 632. *Id*. As summarized by another court, "[t]he First Circuit held that Pan American's filing of a criminal complaint was not an aspect of 'banking' and, therefore, [the individual's] claim of malicious prosecution did not 'arise out of' a

banking transaction, even though the entire episode could be traced back to [the individual's] bounced checks, which are certainly banking transactions." *Sollitt*, 463 F. App'x at 475 (summarizing *Diaz*, 635 F.2d at 31–32). The First Circuit affirmed the district court's dismissal for lack of subject matter jurisdiction. *Diaz*, 635 F.2d at 31.

*Sollitt* is similar. There, an employee of KeyCorp (an Edge Act entity) reported to management that a co-worker was making fraudulent transactions with foreign customers. *Sollitt*, 463 F. App'x at 472. KeyCorp later fired the employee after he was caught with pornography on his work computer. *Id.* The employee filed suit in state court, alleging that he was wrongfully terminated for reporting his co-worker's fraud and misrepresentations, and KeyCorp removed based on § 632. *Id.* The district court denied the employee's motion to remand and later granted summary judgment in favor of KeyCorp, but the Sixth Circuit vacated the judgment with instructions to remand the case to state court. *Id.* at 475. Relying on *Diaz*, the Sixth Circuit reasoned that "KeyCorp's firing of [the employee] was not an aspect of 'banking' and, therefore, [the employee's] claim of wrongful termination did not 'arise out of' a banking transaction, even though the entire episode arguably can be traced back to the [reported international transaction]." *Id.* at 475.

These cases point out an important oddity on the face of § 632 that will be revisited later—conferring jurisdiction on all activities by tracing back the entire chain of causation would extend § 632 to many activities that an Edge Act entity undertakes, even if exercising jurisdiction based on these activities would be inconsistent with the purposes of the Act or simply illogical. *See Sollitt*, 463 F. App'x at 473–74 ("Suppose, for example, that [the employee] had tripped and fallen over a stack of carelessly placed printouts of foreign-currency transactions. This meager association—ridiculous as it is—between the potential negligence claim and the foreign banking

transaction that generated the printouts, would appear to suffice for Edge Act jurisdiction under so limitless a view. That cannot be correct."). In Plaintiffs' view, these cases implicitly draw a distinction between, a "background" transaction and a "dispute-triggering" transaction to avoid this result and put a stop to the infinite chain of causation.

Even assuming that there is a meaningful difference between dispute-triggering and background transactions, the "dispute-triggering" transaction in this case is not an event unrelated to banking or financial operations. Accepting Plaintiffs' theory of the case and assuming that the debt repurchases are the "dispute-triggering" transaction, Plaintiffs disregard that the "dispute" that is "triggered" by the debt repurchases is over the meaning of the indentures, which are also part of the operative "background transaction." Unlike *Sollitt* and *Diaz*, where the dispute arose from operations outside of a banking or financial transaction, the dispute-triggering transaction here is the same financial operation that forms the background of the Plaintiffs' claim. *See Stamm v. Barclays Bank of New York*, 960 F. Supp. 724, 728 (S.D.N.Y. 1997) ("It is commonly understood that the sale of securities for the purposes of raising capital is a kind of financial operation [for purposes of § 632].").

In sum, because this litigation is based on a construction of the indentures, Plaintiffs are incorrect that the debt repurchase alone is the transaction out of which the declaratory judgment claims arise.

### ii. This declaratory judgment claims arise out of the indentures and PGN financing.

Having discounted Plaintiffs' position, the Court briefly makes an affirmative statement of the transaction out of which the declaratory judgment claims *do* arise. The Noteholder Defendants argue that "[t]he pertinent 'transactions' are those by which iHeart financed more than $6 billon through the Indentures and the Notes." Docket no. 60 at 3; *see also id.* at 17 ("The

18

pertinent Edge Act 'transactions' here are the financing transactions that include the Indentures and the Notes."). The Court agrees.

In general, case law interpreting and applying § 632 is scant and splintered, and there appears to be no cases arising from a directly analogous set of facts to this case. Particularly persuasive, however, is *Racepoint Partners, LLC v. JPMorgan Chase Bank, 06 CIV. 2501(MGC)*, 2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006) [hereinafter *Racepoint I*], *reconsideration denied*, 2007 WL 101866 (S.D.N.Y) [hereinafter *Racepoint II*]. There, Enron bondholders in two actions sought damages for JPMorgan's breach of indenture contracts where JPMorgan, an Edge Act entity, was acting as trustee on the bonds' indentures. *Racepoint I*, 2006 WL 3044416 at *1. The bondholders were divided into two classes—holders of Enron's 1999 Euro bonds, and holders of Enron's 2001 Dollar bonds. *Id.* Responding to the district court's *sua sponte* assessment of Edge Act jurisdiction, the parties argued that the transaction giving rise to the suit was a sham transaction between Enron and two international corporations through which Enron disguised a loan from JPMorgan as a prepaid commodity transaction. *Id.* at *2. By doing so, Enron was able to report the injection of funds as cash from operating activities rather than cash from financing activities, which allegedly showed JPMorgan's actual knowledge of Enron's fraud. *Id.* The Southern District of New York took a broader view of the operative transaction, holding that "Plaintiffs' claims arise out of the issuance of Enron notes in 1999 and 2001 pursuant to the Indenture Agreements." *Id.* at 3. The court reasoned that the bondholders' claims "[did] not 'arise out' of this single international transaction. Plaintiffs' claims are for breach of contract, breach of implied duty of good faith and fair dealing, and breach of fiduciary duty. The duties that defendant allegedly breached arise out of the 1999 and 2001 Indenture

Agreements."[14] *Id.* at *3. In other cases within the contract realm but outside of the trust indenture context, courts have reached similar conclusions regarding the broad scope of "transactions" that give rise to a civil suit for Edge Act purposes. *See Gen. Star Indem. Co. v. Platinum Indem. Ltd. Bank of Am., N A.*, 00 CIV. 4960 (LMM), 2001 WL 40763, at *2 (S.D.N.Y. Jan. 17, 2001) (finding "[t]he transaction out of which this case arises is the . . . Reinsurance Contract" where the plaintiff sought a declaration that it was not bound by that contract); *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 627 F. Supp. 2d 730, 732 (N.D. Tex. 2008) (finding that a Credit Agreement was the "transaction" giving rise to the suit where "[t]he Plaintiffs [did] not contest that their state law claims [for breach of contract, fraud, negligent misrepresentation, and breach of the duty of good faith and fair dealing] ar[o]se out of the Credit Agreement.").

These cases simply direct the court to consider the plaintiff's allegations and causes of action in construing the scope of the transactions from which the civil suit arises. Applying this common-sense methodology, Plaintiffs' petition is replete with references to the indentures and the PGNs. And, as recounted above, the specific declarations sought by Plaintiffs are clear— Plaintiffs seek declarations construing what the indentures will or will not allow. Docket no. 1-9 at 43 ¶ 179 ("The Court should issue a declaratory judgment stating that Broader Media's Purchase of 2018 Notes did not violate the Indentures, and that Notices of Default based on Broader Media's Purchase of 2018 Notes would not be permitted by the Indentures"); 44 ¶ 193 ("The Court should issue a declaratory judgment stating that additional repurchases of iHeart debt by Broader Media would not violate the Indentures."). For these reasons, the Court finds

---

[14] The court in *Racepoint I* went on to hold that issuance of the 1999 Euro bonds (to be paid in euros in London) was an "international or foreign transaction," but that the same was not true of the 2001 Dollar bonds. *Racepoint I*, 2006 WL 3044416 at *3. The court remanded the 2001 Dollar bondholders' claims accordingly. *Id*. The Court will revisit this aspect of *Racepoint I* later in this order.

that the transaction giving rise to the declaratory judgment claims are the underlying financing and indenture transactions.

### b. Whether the issuance of the PGNs and indentures are offshore financial transactions of the Trustee Defendants.

Up to this point, the Court has largely agreed with the Noteholder Defendants' characterization of Plaintiffs' claims. Here, however, the Court breaks with the Noteholders. Though the transactions out of which Plaintiffs' declaratory judgment claims arise are the financing transactions of the PGNs and the indentures, these are not offshore financial transactions *of the Trustee Defendants*. Accordingly, the third prong of § 632 is not satisfied and this case must be remanded.

The Noteholder Defendants' broad characterization of the transactions out of which the declaratory judgment claims arise encounters a conceptual difficulty when transposed on the clear pronouncement of § 632's text, as interpreted by *AIG*. For purposes of this analysis, § 632 jurisdiction will only exist to the extent that *the Trustee Defendants*, through their role in the financing transactions and indentures giving rise to the declaratory judgment claims, engaged in offshore financial transactions. Even though the Trustee Defendants' played a role in the broader financing transaction, their role as it relates to this dispute was limited to the indentures, which are wholly domestic contracts between domestic entities. Accordingly, there is no Edge Act Jurisdiction.

### i. *AIG*'s Nexus Requirement

In assessing the factual characterizations of the Trustee Defendants' role in the operative financial transaction, the Court begins with *AIG*. Without rehashing the full summary of *AIG*'s construction of § 632's text provided above, the Court simply restates the elemental requirement that "the suit [must] arise[ ] out of transactions involving [offshore banking or financial

21

operations], *which [the Edge Act entity] has conducted* either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries." *AIG*, 712 F.3d at 780–81 (emphasis added). In other words, and as numerous other courts have recognized, *AIG* "insert[s] a formal nexus requirement into the Edge Act: section 632 only confers federal jurisdiction if the suit arises out of an offshore banking or financial transaction *of that federally chartered corporation*." *E.g.*, *Salix* 2013 WL 6847064, at *6 (emphasis original) (internal quotations omitted).

In light of *AIG*, the question then becomes how direct of a nexus § 632 requires between the Edge Act entity and the offshore financial transaction. On this point, the case law is scattered and provides only factual situations to which this Court can analogize. Despite the lack of a clear statement of law on how direct this nexus must be, the Court is aware of no case in which § 632 confers jurisdiction based on transactions of an Edge Act entity where the entity is accused of no wrongdoing (through its transactions or otherwise) and where its conduct has so little to do with the offshore financial transaction that gives rise to the claim. This Court holds that the Edge Act does not permit the exercise of federal jurisdiction in such a case, as here.

*Racepoint I*, in which the court took a broad view of the transactions giving rise to Enron bondholders' claims, is a solid starting point for construing the nexus requirement of § 632. *See supra* note 14 and accompanying text (summarizing *Racepoint I*'s holding in terms of defining the transaction that gave rise to the suit). There, two groups of bondholders—holders of Enron's 1999 Euro bonds and holders Enron's 2001 Dollar bonds—sued JPMorgan, the indenture trustee, for damages based on JPMorgan's conduct in relation to the indentures. *Racepoint I*, 2006 WL 3044416 at *1–2. The court held that it had jurisdiction over claims arising from issuance of the 1999 Euro bonds, which were to be paid in London in Euros, because this issuance was an

22

international or foreign transaction from which the suit arose. *Id*. at *3. With little explanation, however, the court found that the same was *not* true of the 2001 Dollar bonds, and remanded those claims. *Id*.

JPMorgan moved for reconsideration of the decision to remand claims related to the 2001 Dollar bonds. *See Racepoint*, Case Nos. 06-Civ-2500, 2501 (S.D.N.Y.), Docket nos. 18, 22 (JPMorgan's Memorandum of Law in Support of its Motion for Reconsideration). Among the arguments pressed by JPMorgan was that § 632 jurisdiction existed because "the 2001 bonds were sold pursuant to offering materials that clearly contemplated the sale of the bonds internationally and the clearing of such sales through international clearing systems" and the bonds were in fact sold internationally. *Id*. at 11. Again, with little explanation, the court denied the motion for reconsideration, calling this argument "unpersuasive," noting that it "[did] not raise any new issues that were overlooked," and clarifying that it was "previously considered" and "rejected." *Racepoint II*, 2007 WL 101866 at *1. For purposes of this Court's analysis, two main points from *Racepoint II* are important—(1) the court rejected the argument that the international marketing and eventual sale of the dollar bonds rendered the accompanying indentures an international transaction; and (2) the court was not satisfied that the indenture trustee engaged in an international transaction where the dollar bonds were sold internationally even though the trustee was accused of actual wrongdoing in relation to those bonds.

Similarly instructive on the nexus required between the Edge Act entity and the offshore financial transaction giving rise to a suit are two cases involving the sale of residential mortgage-based securities. *Sealink Funding Ltd. v. Bear Stearns & Co. Inc.*, 12 CIV. 1397 LTS HBP, 2012 WL 4794450 (S.D.N.Y. Oct. 9, 2012); *Landesbank Baden-Wurttemberg v. Capital One Fin. Corp.*, 954 F. Supp. 2d 223, 224 (S.D.N.Y. 2013). In both cases, plaintiffs brought state law

claims based on misrepresentations made in documents and materials related to offerings of the
RMBSs.

In *Sealink*, Chase Bank's role in the sale of the RMBSs was limited to "creating U.S.
trusts that held U.S. mortgages—actions that had no international dimension." *Sealink*, 2012 WL
4794450 at *5. The court found that the "connection between Chase Bank's involvement in this
action and the ultimate sale of RMBS to plaintiff are too attenuated to support Edge Act
jurisdiction" because "[t]he fact that other Defendants ultimately decided sell the RMBS to
foreign entities could well have been fortuitous as far as Chase Bank was concerned. That
decision was also far downstream from Chase Bank's participation in the packaging of RMBS."
*Id*.

Similarly, in *Landesbank*, CCB (an Edge Act entity) sold mortgage loans to a depositor,
who in turn assigned the loans to a trustee. *Landesbank*, 954 F. Supp. 2d at 225. CCB acted as a
servicer, "perform[ing] functions such as collecting payments from mortgagers," but ultimately
had no direct contact with ultimate purchasers of the loans, who were plaintiffs in the case. *Id*.
Relying in part on *Sealink*, the court remanded:

> CCB did not directly sell any securities to the plaintiffs; rather, the underwriters
> did. Moreover, the certificates were delivered by a trustee (not CCB) to a
> depositor (also not CCB), which assigned the loans to the trustee. CCB's role
> simply entailed selling the underlying loans to the depositor. The connection
> between the sale of the RMBSs and CCB is too tenuous to provide the nexus
> necessary to exercise federal jurisdiction.

*Id*. at 227.

The Noteholder Defendants rely primarily on two pre-*AIG* cases to argue for a weaker
nexus requirement. The first is *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings,
Inc*., 627 F. Supp. 2d 730 (N.D. Tex. 2008), in which a group of lenders, one of whom was a
Bermudan partnership, sued a group of borrowers and JPMorgan, asserting state law claims

surrounding a Credit Agreement. JPMorgan was all of the following: an Edge Act entity, a signatory to the Credit Agreement at issue, a lender of funds, and the administrative and collateral agent of the Credit Agreement. *Id*. at 731. The court found that Edge Act jurisdiction existed because an international party (the Bermudan lender) and an Edge Act entity (JPMorgan) were signatories to the Credit Agreement out of which the suit arose. *Id*. at 733. Also noteworthy is that JPMorgan was sued for damages based on its allegedly fraudulent conduct with respect to the Credit Agreement. *Id*. at 731–32.

The second case upon which the Noteholder Defendants rely is *Travis v. Nat'l City Bank of New York*, 23 F. Supp. 363, 364 (E.D.N.Y. 1938). There, a German steel corporation issued bonds and the defendant, National City Bank (an Edge Act entity), served as indenture trustee on these bonds. *Id*. at 363–64. A bondholder sued City Bank for misconduct under the indentures— in particular, City Bank allegedly received improper payments from the bankrupt German issuer without dispersing these funds in accordance with the indentures. *Id*. at 364. The court held that Edge Act jurisdiction existed based on City Bank's indenture trust relationship with the German issuer, and that the transaction was international because the issuer was German. *Id*. at 365–66.

> ### ii. The nexus between the Trustee Defendants and the international transactions giving rise to Plaintiffs' declaratory judgment claims is too attenuated to support jurisdiction under § 632.

This mix of case law prevents the Court from declaring with confidence precisely how strong of a nexus § 632 requires. Whatever this requirement may be, however, it is not satisfied in this case. There are two primary reasons for this conclusion. First, the issuance of the PGNs in the first place is not an offshore financial transaction *of the Trustee Defendants*. Second, the indentures—the only portions of the financing transaction to which the Trustee Defendants were parties—are wholly domestic contracts.

**1. The Trustee Defendants were not involved in the issuance of the PGNs, which is the only international dimension of the transaction from which the declaratory judgment claims arise.**

As an initial matter, the Court has serious doubts that the issuance of the notes in the first place was an international transaction at all. The Noteholder Defendants argue that the initial plan of distribution and ultimate issuance of the PGNs was from iHeart to certain international investors. In support of their contention, they attach numerous offering circulars relating to the various series of PGNs, each of which contemplates the possibility that the PGNs will be sold internationally. *See, e.g.*, Docket no. 60-4 at 2, 3, 5.

The Noteholders oversimplify the nature of the PGNs' issuance. The same offering circulars that they cite as evidence for the international nature of the offerings indicates that there was a domestic intermediary between iHeart (as issuer) and any international noteholders. As explained by Plaintiffs in their reply:

> [T]hose Offering Circulars say that iHeart sold the Notes to a series of investment banks—defined in the Offering Circulars as "initial purchasers"—all of whom were domestic companies. Those "initial purchasers . . . committed to take and pay for all of the notes being offered." As shown in the SEC Form 8-K disclosures that Defendants attached . . . to their Opposition, the Initial Purchasers "subsequently sold" interests in the PGNs to other investors, and those instruments eventually traded on the public markets. Foreign entities could acquire these interests through these secondary market transactions—not from iHeart.

Docket no. 62 at 7–8 (citations omitted).

The Noteholder Defendants write off the issuance of notes through the initial purchasers as "a single set of offerings by iHeart to international investors which resulted in the global sale of Notes at issuance."[15] Docket no. 65-1 at 4. They point to the offering circulars, which state

---

[15] The only legal support from this proposition comes from a single case from the Southern District of New York. *See United States v. Morgan*, 118 F. Supp. 621 (S.D.N.Y. 1953) (noting "the basic underlying characteristics of the relationship between the issuer, the investor and the group of underwriters and dealers, who together serve the

that iHeart indemnified the initial purchasers and is responsible for the information in the circulars. Docket no. 65-3 at 3, 12. These offering circulars also clearly reflect that the notes may ultimately be sold to international investors. *See generally id.* The Noteholders also argue that iHeart admits to marketing the notes through the offering circulars in its petition and through a declaration. *See* Docket no. 1-9 ("iHeart and its underwriters marketed the Notes to investors with Offering Circulars"); Docket no. 62-1 at 1–2 (iHeart's Senior Vice President and Treasurer declaring that "I participated in the drafting of the Offering Circulars for the PGNs and the marketing of investments in the PGNs to potential investors . . . I was involved in marketing investments in the Notes to potential investors."). This combination of facts, the Noteholders argue, shows that the initial issuance was an international transaction.

This conclusion is not so clear. iHeart undoubtedly played a role in creating the offering circulars and marketing the PGNs. iHeart also apparently recognized the possibility that international purchasers would eventually end up as noteholders. But the offering circulars themselves, aside from indicating that iHeart marketed the notes and indemnified the initial purchasers, also show that the initial purchasers had considerable discretion and power over subsequent sales:

> The initial purchasers are committed to take and pay for all of the notes being offered, if any are taken. The initial offering price is set forth on the cover page of this offering circular. *After the notes are released for sale, the initial purchasers may change the offering price and other selling terms. The offering of the notes by the initial purchasers is subject to receipt and acceptance and subject to the initial purchasers' right to reject any order in whole or in part.*

Docket no. 65-3 at 9 (emphasis added). And finally, though iHeart may have contemplated (in the offering circulars) that the PGNs would be sold internationally, it would be the initial purchasers—not iHeart—who would make that sale. *See Landesbank*, 954 F. Supp. 2d at 225,

---

issuer in making the *single, entire, unitary transaction* possible by shaping up the issue, underwriting the risk and planning and carrying out the distribution." (emphasis in the Noteholder's sur-reply)).

227 ("[W]hile CCB may be labeled as a 'seller' [of RMBSs] in these documents, it does not have direct contact with any ultimate purchasers of the loans, such as plaintiffs . . . CCB did not directly sell any securities to the plaintiffs; rather, the underwriters did.").

In any event, the parties have barely addressed the legal effect of the initial purchasers' role as intermediaries,[16] and the Court need not decide whether this presence renders the underlying financing transaction a wholly domestic one. Even assuming that the initial issuance *was* an international transaction, the Trustee Defendants had no role in the marketing and sale of the PGNs. Brian Coleman, iHeart's Senior Vice President and Treasurer, declared that:

> As I understand, the Trustees were not involved in marketing investments in the Notes to potential investors. The trustees were not parties to and had no involvement in the sale of investments in the Notes from iHeart to initial purchasers. As I understand, the trustees are not parties to and have no involvement in trades of investments in the Notes, including transactions in which initial purchasers of investments in the Notes sold them to investors.

Docket no. 62-1 at 2. In short, iHeart marketed the PGNs through the offering circulars and sold the PGNs through the initial purchasers without any involvement from the Trustee Defendants in this process.

This finding is consistent with *Racepoint II*, in which the court found a near identical argument unpersuasive. There, JPMorgan argued that because "the 2001 bonds were sold pursuant to offering materials that clearly contemplated the sale of the bonds internationally and the clearing of such sales through international clearing systems," the financing transaction, which was a step removed from the indenture trustee, provided a basis for § 632 jurisdiction. *Racepoint*, Case Nos. 06-Civ-2500, 2501 (S.D.N.Y.), Docket nos. 18, 22 (JPMorgan's Memorandum of Law in Support of its Motion for Reconsideration). On reconsideration, the court took stock of this argument that it previously "overlooked case law establishing that subject

---

[16] *See supra* footnote 15 and accompanying text.

matter jurisdiction exists under the Edge Act, 12 U.S.C. § 632, if any part of a suit arises out of transactions involving international or foreign banking or financial operations, *even if those transactions are not themselves central to the suit*." *Racepoint II*, 2007 WL 101866 at *1 (emphasis added). The emphasized language shows that the court acknowledged and rejected the argument that the issuance of dollar-denominated bonds internationally had a sufficient nexus to the suit, and invalidates the Noteholder Defendants' argument that *Racepoint II* solely addressed the definition of the underlying transaction.[17]

The Noteholder Defendants also argue that "[w]ithout the Trustees, no foreign person could have bought, held or traded the Notes as contemplated by iHeart's Offering Circulars." Docket no. 65-1 at 4. This is probably true. It is also true that no person—foreign or domestic— could have bought, held, or traded the Notes absent the Trustees. As the Noteholders themselves indicate, it was iHeart—not the Trustees—who contemplated that the PGNs might be sold internationally. The Trustees had no control over who the ultimate purchasers of the notes were (whether foreign or domestic),[18] and from their perspective, the identity of the ultimate noteholder is irrelevant. *See Sealink*, 2012 WL 4794450 at *5 ("The fact that other Defendants ultimately decided sell the RMBS to foreign entities could well have been fortuitous as far as Chase Bank was concerned."). More importantly, the Noteholders' argument weakens the nexus requirement of *AIG* to a minimal connection akin to but-for causation that is not supported by the case law. *See Lazard Freres & Co. v. First Nat. Bank of Md.*, 91 CIV. 0628 (KMW), 1991 WL

---

[17] On this aspect of *Racepoint II*, the Noteholder Defendants argue that the reconsideration decision "did not address [the argument relating to international issuance and sale of the bonds] on the merits because neither the argument nor the supporting evidence had been presented previously, and the court explained that '[a] party moving for reconsideration may not advance new facts.'" Docket no. 60 at 26–27 n. 13. This is not a proper reading of the reconsideration decision. Though the court mentions the language of advancing new facts in its legal standard, it expressly states that it previously considered these arguments and that they raise nothing new. *Racepoint II*, 2007 WL 101866 at *1.

[18] The Trustees were even further distanced from the ultimate purchasers of the PGNs by the presence of the initial purchasers.

221087, at *2 (S.D.N.Y. Oct. 15, 1991) ("[A] district court cannot find that it has § 632 jurisdiction merely because there was a federally chartered bank involved, there were banking-related activities, and there were foreign parties."). Thus, the Trustee Defendants' non-involvement in the international issuance of the PGNs precludes the exercise of § 632 jurisdiction based on those sales.

### 2. The only involvement of the Trustee Defendants in the transaction giving rise to the declaratory judgment claims is in the indentures, which are wholly domestic contracts.

The Court next turns to the indentures themselves, which are the contracts that tie the Trustee Defendants to this litigation. The parties to these contracts are the Trustee Defendants, iHeart, and certain domestic iHeart subsidiaries that act as guarantors on the PGNs. The Noteholder Defendants are not signatories to the contracts, nor are any other international parties. Docket no. 45-1 (iHeart's Senior Vice President and Treasurer declaring that "I am aware that some investors in the PGNs claim to be foreign entities. Investors in the Notes are not parties to the Indentures. I am not aware of any contract relating to the Indentures in which any of the Trustees and any foreign entity are co-parties. I do not believe that any such contract exists."). Under the indentures, the Trustees must engage in "ongoing supervision" of the PGNs, but there is no explanation of how the declaratory judgment claims arose from these supervision activities. *See supra* footnote 13.

Here, an analysis of the case law construing transactions in light of § 632 is critical. Starting with the cases cited by the Noteholders, both *Highland* and *Travis* are distinct. Initially, both cases involve allegations of actual wrongdoing on the part of the Edge Act entity, as discussed later. Second, the operative offshore financial transactions in each case are different. In *Highland*, the dispute surrounded a Credit Agreement between borrowers, JPMorgan as

collateral agent to the agreement, and lenders, one of whom was a Bermudan limited partnership and another of whom was JPMorgan.[19] *Highland*, 627 F. Supp. 2d at 731. Quite simply, the contract was an international one because it was a contract with international parties. Similarly, in *Travis*, the issuer of the underlying notes was German, and the indenture that the trustee defendant allegedly breached was the indenture between the German issuer and the domestic trustee. *Travis*, 23 F. Supp. at 363–64. Again, the presence of an international party as a signatory to the contract that was allegedly breached by an Edge Act entity is what made this an international transaction.[20]

A number of other cases support the conclusion that a contract between domestic entities will not give rise to § 632 jurisdiction. In *Racepoint I*, the court remanded bondholder's breach of indenture claims against JPMorgan, even though the dollar notes were initially sold to international holders and even though JPMorgan, as indenture trustee, was accused of actual wrongdoing under the notes. In *Sealink*, the court remanded where Chase Bank placed domestic mortgages into domestic trusts that were eventually sold internationally by other defendants. In *Landesbank*, the court remanded where an Edge Act entity sold mortgage loans to a depositor

---

[19] It is also noteworthy that the Edge Act entity in *Highland*, JPMorgan, was not simply the collateral agent who contracted to perform administrative functions on an international Credit Agreement. JPMorgan was also a lender. Downplaying the significance of this distinction, the Noteholder Defendants point to a single sentence from the court's opinion to argue that the *Highland* court distinguished JPMorgan from the other lenders without putting stock in its status as a lender: "The Court agrees with the Plaintiffs that this suit . . . arises out of the Credit Agreement among the Plaintiff lenders, the Defendant borrowers, and the Defendant bank." *Highland*, 627 F. Supp. 2d at 735; Docket no. 60 at 27.

It is not surprising that the *Highland* court would distinguish JPMorgan (who was a lender *and* collateral agent) from the other lenders (who were simply lenders). Still, it is unclear whether the *Highland* court viewed JPMorgan as collateral agent, as lender, or as both. At the very least, the court did not view JPMorgan as the collateral agent and nothing more, which suggests that JPMorgan's role as an investor strengthened its nexus to the offshore financial transaction. *See Highland*, 627 F. Supp. 2d at 735 ("JPMorgan has . . . engaged in a traditional banking activity by making loans under the Agreement" (citations omitted)).

[20] In an attempt to evade the fact that they were not parties to the indentures, the Noteholder Defendants argue that they "effectively are parties to the Indentures." Docket no. 60. They argue that absent noteholders, the indenture is not operative. *Id*. Further, they point out that Plaintiffs' damages claims proceed on the theory that the Noteholders are breaching the indenture agreements (even though they are not formal parties to these agreements). *Id*. As Plaintiffs point out, however, "'effectively' are parties [to the indentures] is merely a euphemism for 'are not, in fact, parties.'" Docket no. 62 at 8.

and collected payments on these mortgages because the connection between these actions and the sale of residential mortgage-based securities to foreign plaintiffs was "too tenuous to provide the nexus necessary to exercise federal jurisdiction."

As in *Racepoint I*, *Sealink*, and *Landesbank*, the securities at issue in this case were sold internationally. But the Trustee Defendant's duties with respect to these securities are limited to the indentures, which are contracts with domestic entities only. Though the issuance of the PGNs adds a foreign aspect to the background of this case, this international tie-in is not the basis of any cause of action and in no way gives rise to the declaratory judgment claims. Instead, the declaratory judgment claims seek a construction of the wholly domestic indentures as they relate to Plaintiffs' actions. There is nothing international about such a declaration, especially as it relates to the Trustee Defendants.

### iii. Exercising jurisdiction under § 632 in a case such as this one does not serve the purposes of the statute.

Finally, the Court returns to the purposes of § 632. However broadly or narrowly Congress intended for § 632 to be, extending it to this case would not serve the purposes of the statute. As stated in *AIG*, "[t]he apparent purpose of § 632 was to give Edge Act banks predictable uniformity of adjudication supervised in the federal courts, and thus better protection against potentially divergent and conflicting strictures imposed by banking authorities of 48 states." *AIG*, 712 F.3d at 779.

The declaratory judgment claims are not about the Trustee Defendants' conduct. Plaintiffs do not seek damages from the Trustees, nor do they allege that the Trustees did anything wrong. The Trustees are parties to this case simply so that they will be on notice of any declaratory judgment that construes a domestic contract to which they are a party. It is unclear

what "predictable uniformity" the Trustees might need in a case like this one, in which they are not accused of doing anything wrong.

Indeed, in the vast majority of cases in which § 632 provides a proper basis for jurisdiction, there is an allegation of actual wrongdoing or a claim for damages against the Edge Act entity involved in the suit. In *Highland*, for example, the plaintiffs sued JPMorgan for damages based on its fraudulent conduct with respect to the Credit Agreement that was the offshore financial transaction giving rise to the suit. *Highland*, 627 F. Supp. 2d at 731–32. The same was true in *Travis*, where an indenture trustee was named as a defendant and accused of actual fraud and misconduct under the indenture in receiving (but improperly refusing to disperse) funds from the German issuer. *Travis*, 23 F. Supp. at 364. Even in many of the cases where courts ultimately decline to exercise § 632 jurisdiction, the Edge Act entity is accused of actual wrongdoing and subject to liability. *E.g., Racepoint I*, 2006 WL 3044416 at *1–2.

To be clear, this is not to say that the nexus aspect of § 632 requires that the alleged wrongdoing be that of the relevant Edge Act entity. Nor does the nexus necessarily require that the relevant Edge Act entity be exposed to the risk of liability in the litigation, as some other courts have stated. *See, e.g., Nacional Financiera, S.N.C. v. Chase Manhattan Bank, N.A.*, 00 CIV 1571 JSM, 2001 WL 327159, at *3 (S.D.N.Y. Apr. 4, 2001) ("The transaction must contain some foreign aspect, and where the national bank is not a central party to the underlying transaction, the suit must nevertheless expose it to the risk of liability"); *see also Bata v. Cent.-Penn Nat. Bank of Phila.*, 223 F. Supp. 91, 94 (E.D. Pa. 1963).[21] The Court notes, however, that the absence of these two factors here reveals the weakness of the nexus between the Trustee

---

[21] "The bank in the present case has no interest in the outcome of the suit. Indeed, at the trial of the case its counsel's only problem will be to decide at which table to sit. The decision on the merits will be binding upon the real parties in interest, not affecting the bank's position. We cannot hold that Congress intended to enlarge the closely guarded jurisdiction of federal courts to bring within it the present controversy simply because of the tenuous connection of [the Edge Act entity] with the present suit." *Bata*, 223 F. Supp. at 94.

Defendants and the operative offshore financial transaction. With such a tenuous connection, it is difficult to understand how Trustees would take advantage of the supposed consistency and predictability of the federal forum that § 632 was meant to provide.

## CONCLUSION

Plaintiffs' motion to remand (Docket no. 45) is GRANTED because this Court does not have jurisdiction over the declaratory judgment claims against the Trustee Defendants under the Edge Act, 12 U.S.C. § 632. Because there is no original jurisdiction over any claims in this lawsuit, the Court need not reach the parties' arguments on whether there is supplemental jurisdiction over the damages claims. *See* 28 U.S.C. § 1367(a). Accordingly, this case is hereby REMANDED to the state court.

It is so ORDERED.

SIGNED this 16th day of March, 2017.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE